[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11229

_____

D.C. Docket No. 1:18-cv-00063-CG-B

WALTER LEROY MOODY, JR.,

Petitioner - Appellant,

versus

WARDEN HOLMAN CF,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(April 18, 2018)

Before WILSON, MARTIN, and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

Walter Leroy Moody, Jr. faces execution on April 19, 2018, in Alabama for

the 1989 murder of Eleventh Circuit Judge Robert Vance.  After the Alabama

Supreme Court set an execution date, Mr. Moody filed a counseled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  He named the warden of the Alabama facility where he is currently incarcerated as the respondent, and asserted in two related claims that under federal law Alabama cannot legally carry out his scheduled execution.  He argued that before Alabama can put him to death, he must first be returned to the custody of the United States to serve federal sentences of life imprisonment which had been imposed on him at an earlier time.  If Mr. Moody is correct, Alabama will never be able to execute him because he will die in federal prison.

The district court ruled that Mr. Moody lacked Article III standing and that he failed to obtain Eleventh Circuit authorization for his second claim, which amounted to an unauthorized second or successive habeas corpus petition under 28 U.S.C. § 2254.  *See* 28 U.S.C. § 2244(b)(2)–(3).  It therefore dismissed his case without prejudice.  When Mr. Moody appealed, we expedited briefing and invited the United States to present its views.  We heard oral argument on April 12, 2018.

We affirm the dismissal of Mr. Moody's § 2241 petition, but on different grounds.  We conclude that Mr. Moody has standing, and that his second claim does not constitute an unauthorized second or successive § 2254 petition.  We also hold, however, that Mr. Moody's claims fail on the merits, and we remand the case

2

to the district court with instructions to enter a judgment dismissing those claims with prejudice.[1]

## I

In December of 1989, Mr. Moody mailed four package bombs to locations in Alabama, Georgia, and Florida.  Two of those bombs detonated, killing United States Circuit Judge Robert Vance at his home in Alabama and civil rights attorney Robert Robinson at his office in Georgia.

A federal jury convicted Mr. Moody of 71 charges related to the bombings, and the district court sentenced him in August of 1991 to seven consecutive terms of life imprisonment and a concurrent term of 400 years.  The district court remanded Mr. Moody "to the custody of the United States Marshal," D.E. 1, Exh. A at 3, and he was incarcerated at the United States Penitentiary in Marion, Illinois.  His federal convictions and sentences were affirmed on direct appeal.  *See United States v. Moody*, 977 F.2d 1425 (11th Cir. 1992).

After the federal proceedings, a grand jury in Jefferson County, Alabama, indicted Mr. Moody for the murder of Judge Vance and the injuries sustained in the explosion by his wife, Helen Vance.  To secure custody of Mr. Moody for prosecution in Alabama, a state circuit court issued a writ of habeas corpus ad prosequendum on February 17, 1992.  That writ ordered the United States Marshal

---

[1] We are grateful for the assistance provided by counsel for Mr. Moody, Alabama, and the United States, and thank them for their excellent work.

and the Sheriff of Jefferson County to "produce the body of" Mr. Moody before the court for a hearing, and for a trial then scheduled for May 4, 1992. *See* D.E. 1, Exh. B. The writ also contemplated that Alabama authorities would return Mr. Moody to federal custody once the state proceedings were over. It stated that "at the conclusion of said hearing the body of . . . [Mr.] Moody . . . be returned to the custody of the United States Marshal in the U.S. Penitentiary, Marion, Illinois, all in accordance with the regulations and directions of the United States Marshal." *Id*. Several days later, the writ was executed and Mr. Moody was brought from Marion to Jefferson County.

An Alabama jury found Mr. Moody guilty of capital murder and assault, and in February of 1997 the trial court sentenced him to death for Judge Vance's murder. In December of 1998 the United States Marshal for the Southern District of Alabama filed a detainer with the Alabama Department of Corrections. The detainer acknowledged that Mr. Moody was in Alabama custody and requested as follows: "Prior to [Mr. Moody's] release from your custody, please notify this office at once so that we may assume custody of [him] for service of his Federal sentence of imprisonment." D.E. 1, Exh. G. The detainer also stated that "[t]he notice and speedy trial requirements of the Interstate Agreement on Detainers Act do NOT apply to this [d]etainer." *Id*. The Alabama Department of Corrections acknowledged receipt of the federal detainer on December 22, 1998. The detainer

4

did not request that Mr. Moody be transferred to federal custody once his state court proceedings were completed.

Mr. Moody appealed his state convictions and sentences, but the Alabama Court of Criminal Appeals affirmed. *See Moody v. State*, 888 So. 2d 532 (Ala. Crim. App. 2003), *writ denied*, 888 So. 2d 605 (Ala. 2004). After pursuing state post-conviction remedies, Mr. Moody sought federal habeas corpus relief pursuant to 28 U.S.C. § 2254. The district court denied Mr. Moody's § 2254 petition, and we affirmed. *See Moody v. Commissioner*, 682 F. App'x 802 (11th Cir. 2017).

Mr. Moody has been on death row at Holman Correctional Facility in Atmore, Alabama, for the last 20 years. He has never been returned to the United States Penitentiary in Marion, Illinois. In this court, the United States has stated—in writing and at oral argument—that it has no objection to Alabama maintaining custody of Mr. Moody for the purpose of carrying out the death sentence.

## II

Mr. Moody argues on appeal that he is entitled to habeas relief under § 2241 because Alabama's wrongful retention of him violates the writ of habeas corpus ad prosequendum (through which he was transferred to Alabama for prosecution), federal law, and his constitutional right to due process. *See* Petition at 6–11. He relies on 28 C.F.R § 527.31(c), which provides that a state requesting transfer of a federal prisoner pursuant to a writ of habeas corpus ad prosequendum must state in

its request that it "will return the inmate to [federal] custody promptly on conclusion of the inmate's appearance in the state or local proceeding for which the writ is issued." *See also* 4B U.S. Op. Off. Legal Counsel 719, 728, 1980 WL 20978 (1980) (explaining that "[a] non-IAD agreement to transfer custody to a state for purposes of prosecution should include all legally available safeguards of both the prisoner's and the government's interests"). He also contends that he is serving his federal sentences in a designated state facility, and that, as a result, Alabama cannot execute him until his federal sentences of life imprisonment are completed. *See* 18 U.S.C. § 3621(a) ("A person who has been sentenced to a [federal] term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of [18 U.S.C. §] 3624.").

Our review of Mr. Moody's § 2241 claims is de novo. *See, e.g.*, *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015); *Santiago-Lugo v. Warden*, 785 F.3d 467, 471 (11th Cir. 2015). The same plenary standard of review governs two questions antecedent to the merits: whether Mr. Moody has standing, and whether his second claim constitutes an unauthorized second or successive § 2254 petition. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d

6

1257, 1268 (11th Cir. 2006) (standing); *Stewart v. United States*, 646 F.3d 856, 858 (11th Cir. 2011) (second or successive petition).[2]

## A

In a number of cases where prisoners have challenged the order in which they were to serve sentences imposed by different sovereigns, we have said that they lacked "standing." *See, e.g.*, *DeLong v. United States*, 474 F.2d 719, 720 (5th Cir. 1973) ("It is settled that where one sovereign surrenders a prisoner to another sovereign for trial, sentencing, and execution of the sentence before he is to be returned to the custody of the sovereign first having jurisdiction, the prisoner has no standing to attack the agreement between sovereigns[.]"); *Chunn v. Clark*, 451 F.2d 1005, 1006 (5th Cir. 1971) ("a prisoner has no standing to contest an agreement between two sovereigns concerning the temporary exchange of custody of the prisoner on a writ of habeas corpus ad prosequendum, or their agreement as to the order of his prosecution and execution of sentences"). The district court, relying on these cases, ruled that Mr. Moody lacked Article III standing to pursue

---

[2] We asked the parties to brief whether or not Mr. Moody needs a certificate of appealability to assert his claims on appeal. We agree with the parties that no certificate is needed because the district court dismissed Mr. Moody's § 2241 petition for lack of subject-matter jurisdiction—i.e., lack of Article III standing. *See Hubbard v. Campbell*, 379 F.3d 1245, 1247 (11th Cir. 2004) ("a certificate [of appealability] is unnecessary to permit us to review the district court's order of dismissal"). Alabama recognizes that *Hubbard* is binding, but argues that it was wrongly decided. To avoid any issues should a certificate be required, we alternatively grant one on both of Mr. Moody's claims. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (permitting the issuance of a certificate of appealability if the petitioner shows that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (quotation marks omitted).

the relief requested in his § 2241 petition and dismissed his case without prejudice for lack of subject-matter jurisdiction.

Mr. Moody challenges this ruling on appeal, while Alabama defends it. The United States, for its part, submits that Mr. Moody has standing. Given the language in some of our prior cases, we can understand why the district ruled the way that it did. Nevertheless, the district court's understanding of our precedent—while reasonable—was mistaken.

The Supreme Court has cautioned that federal courts "must not 'confuse weakness on the merits with absence of Article III standing.'" *Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011)) (alteration adopted). At times, these "distinct concepts can be difficult to keep separate." *Bond v. United States*, 564 U.S. 211, 218 (2011). But "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). *See also Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) (explaining that Article III standing "must be addressed prior to *and independent of* the merits of a party's claims") (emphasis added). *Cf. Chafin v. Chafin*, 568 U.S. 165, 174 (2013) ("Ms. Chafin argues that the case is moot because the [d]istrict [c]ourt lacks the authority to issue a re-return order under the [Hague] Convention or pursuant to its inherent equitable powers. But that

argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits.").

In *Bond*, the Supreme Court faced a similar issue due to loose language in its own precedent. In *Tennessee Electric Power Company v. Tennessee Valley Authority*, 306 U.S. 118 (1939), the Court had treated "standing" and the lack of a "cause of action" as interchangeable concepts, explaining that a power company lacked "standing" because it had "no right to sue for an injunction." *Bond*, 564 U.S. at 218 (quoting *Tenn. Elec.*, 306 U.S. at 142). *Bond* explained that viewing these concepts as interchangeable caused confusion, and that its "decisions since *Tennessee Electric* ha[d] been careful to use the terms 'cause of action' and 'standing' with more precision." *Bond*, 564 U.S. at 218.

Heeding that warning, we too have endeavored to treat the concepts distinctly as well. *See, e.g.*, *Culverhouse v. Paulson & Co., Inc.*, 813 F.3d 991, 994 (11th Cir. 2016) (explaining that, to decide standing, "the court must be careful not to decide the questions on the merits," and holding that the district court should have dismissed the case for failure to state a claim, rather than for lack of subject-matter jurisdiction). The reference in our earlier cases to lack of standing is therefore best seen as shorthand for holding that the prisoners in question, as a matter of substantive law, did not have a claim that would entitle them to habeas relief. *See Morse v. United States*, 267 U.S. 80, 82 (1925) (explaining that the

complaint of a prisoner concerning a dispute between two jurisdictions in which he has been charged is "not reviewable on habeas corpus").

Because it relied on the language in our prior cases, the district court did not analyze the familiar three-part test for Article III standing: injury-in-fact, causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). We proceed to conduct that analysis here, keeping in mind that "when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bishoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000).

First, Mr. Moody has alleged an injury-in-fact. He claims that Alabama is wrongfully exercising custody of him and that it refuses to return him to the custody of the United States to serve his federal sentences of life imprisonment. And he contends that, if Alabama is not required to relinquish custody, he will imminently suffer an injury—his scheduled execution. We think it is beyond dispute that the potential loss of life is a cognizable injury for purposes of Article III. As Judge Learned Hand put it in an almost identical case many decades ago: "Obviously [a petitioner facing execution by the state] has actually the greatest possible interest in serving the remainder of his federal sentence." *United States ex rel. Buchalter v. Warden of Sing Sing Prison*, 141 F.2d 259, 259 (2d Cir. 1944).

10

Second, Mr. Moody has alleged causation.  He asserts that Alabama's refusal to return him to the custody of the United States in accordance with federal law is what will cause his execution.  This easily establishes that Mr. Moody's injury (the imminent loss of life due to execution) is "fairly traceable to the challenged action" of Alabama (the failure to return him to the federal government).  *See Lujan*, 504 U.S. at 560 (alterations adopted).  "Proximate cause," after all, "is not a requirement of Article III standing[.]"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014).

Third, Mr. Moody has alleged redressability.  If Mr. Moody is correct and succeeds in obtaining an order (such as an injunction) requiring Alabama to return him to the custody of the United States, his injury would be redressed because— given his federal sentences of life imprisonment—he would not (absent a pardon or early release) be executed.  We therefore conclude that Mr. Moody has sufficiently pled that his injury is likely to be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 561.  *See also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185–86 (2000) ("[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

11

Alabama contends that Mr. Moody has not pled an injury, that he "has no real, personal stake in the outcome of these proceedings," and that "[i]f a prisoner has no right to serve his sentences in any particular order, then he cannot receive redress." Those arguments, however, are not persuasive because they conflate the standing of Mr. Moody with the merits of his claims. There is no Article III requirement that Mr. Moody "demonstrate a connection between the injur[y] [he] claim[s] and the . . . rights being asserted." *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 78 (1978) (rejecting argument that injuries that did not "directly relate[ ] to the constitutional attack" could not "supply a predicate for standing"). Article III also does not demand that the redress sought by a plaintiff be complete. *See I.L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014) (concluding that relief that would "redress (at least in part) the plaintiff's injury [was] enough for standing purposes"). If Alabama were correct, then a plaintiff who ultimately loses on the merits (and by definition did not have a substantive right to relief) would never have had standing to pursue his or her claims in the first place. The law does not countenance, much less demand, such a result. *See Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."). *Cf. Chafin*, 568 U.S. at 174 (explaining that an argument regarding "the legal availability of a certain kind of relief" goes to the

12

merits, and that the "prospects of success are therefore not pertinent to the mootness inquiry").

## B

"[C]hallenges to the execution of a sentence, rather than the validity of the sentence itself, are properly brought under § 2241." *Antonelli v. Warden*, 542 F.3d 1348, 1352 (11th Cir. 2008).  We conclude that the district court erred in ruling that Mr. Moody's second claim under § 2241 amounted to an unauthorized second or successive § 2254 habeas corpus petition within the meaning of § 2244(b)(2)–(3).  The second claim goes to the execution, i.e., the manner of carrying out, Mr. Moody's Alabama sentences, and not to the validity of those sentences.

As the Supreme Court has explained, "[a] § 2254 petitioner is applying for something: His petition 'seeks invalidation (in whole or in part) of the judgment authorizing the prisoner's confinement[.]' . . . Thus, both § 2254's text and the relief it provides indicate that the phrase 'second or successive' [in § 2244(b)] must be interpreted with respect to the judgment challenged." *Magwood v. Patterson,* 561 U.S. 320, 332 (2010) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 83 (2005)) (emphasis removed).  The second claim in Mr. Moody's § 2241 petition does not seek to vacate or set aside any of the Alabama convictions and sentences.  Instead, the claim requests that those sentences (including the death sentence for the murder

13

of Judge Vance) be carried out only after Mr. Moody serves the sentences first meted out by the United States.

We recognize, of course, that if Mr. Moody is ultimately successful in his § 2241 petition, and if he fully serves his federal sentences, he will effectively prevent Alabama from ever executing him.  But that is not because the Alabama sentence of death is claimed to be legally invalid under federal law.  It is because of the order in which the two sovereigns must (in Mr. Moody's view) carry out their respective sentences, and because of the length of the federal sentences.  If Mr. Moody, for example, had been sentenced to a total of 20 years in prison for his federal offenses, his transfer to federal custody after the Alabama proceedings were complete would not have prevented Alabama from carrying out the death penalty because Alabama would have obtained custody of Mr. Moody again once his federal sentences were fully served.

## C

This brings us to the merits.  Three Supreme Court cases from the 1920s set the stage for our review of Mr. Moody's claims on appeal.

In *Ponzi v. Fessenden*, 258 U.S. 254 (1922), a habeas corpus case, a prisoner in federal custody following his conviction on federal charges sought to challenge his transfer to state custody to face state charges through a writ of habeas corpus ad prosequendum issued by a state court.  The Supreme Court affirmed the denial of

habeas relief. It explained that, "[u]ntil the end of his [federal] term and discharge, no state court could assume control of [the prisoner's] body without the consent of the United States." *Id.* at 261. Although there was "no express authority authorizing the transfer of a federal prisoner to state court" for purposes of a state prosecution, the Supreme Court held that the Attorney General could consent to such a transfer, "provided it d[id] not prevent enforcement of the sentence of the federal court or endanger the prisoner." *Id.* at 262, 263. Because an Assistant Attorney General—at the direction of the Attorney General—had "stated in open court that the United States had no objection to the issuance of the writ, or to the production" of the prisoner for trial in state court, *id.* at 256, the prisoner could not obtain habeas relief. *See also id.* at 260 (explaining that a prisoner who is alleged to have violated the law of two or more sovereigns "may not complain if one sovereignty waives its strict right to exclusive custody of him . . . that the other may also subject him to conviction of [a] crime against it," because this determination "addresses itself solely to the discretion of the sovereignty making it and [ ] its representatives with power to grant it").

Another habeas corpus case, *Morse,* followed a couple of years later. The issue in *Morse* was whether defendants who were traveling to Washington, D.C., for trial on federal charges could be arrested in New York on separate federal charges pending there. *See* 267 U.S. at 82. The Supreme Court rejected the

15

defendants' Fifth Amendment due process claims.  First, the "principle that when the jurisdiction of a court has attached, it must be respected as exclusive until exhausted, is a rule of comity, having a wide application in civil cases but a limited one in criminal cases." *Id.*  Second, "if there be a violation of the rule of comity here, it primarily concerns only the courts or the sovereignty which is their common superior and cannot avail the [defendants] indicted for crimes in different jurisdictions.  Moreover, their constitutional rights are not affected; and if there was any error in any respect, it is not reviewable on habeas corpus." *Id.*

On the heels of *Morse* came *Kelley v. Oregon*, 273 U.S. 589 (1927), which arrived in the Supreme Court on a writ of error.  In that case the Court held that a prisoner who is subject to an unexpired sentence of a term of years and a subsequent sentence of death for different crimes in the same jurisdiction cannot demand that he not be executed until the initial unexpired sentence is completed.  The Court explained that the prisoner "has no vested constitutional right to serve out his unexpired sentence." *Id.* at 593.

None of these Supreme Court cases directly control here. *Ponzi* and *Morse* are distinguishable because they did not involve the service of sentences imposed by different sovereigns, and because *Ponzi* suggests that the consent of the United States to have a convicted federal prisoner tried in state court should not prevent enforcement of an initial (and unexpired) federal sentence; *Kelley* is

16

distinguishable because it involved two sentences imposed by the same sovereign. Nevertheless, the cases provide important background, as they indicate (a) that primary jurisdiction in the criminal realm is a matter of comity that can be waived by the first sovereign in favor of the second sovereign, and (b) that a prisoner does not have a right cognizable in habeas corpus to complain about the order of his prosecutions or sentences. *See generally* B. Van Arsdale et al., Federal Procedure § 22:52 (Feb. 2018) ("[A] defendant who has violated the laws of both the United States and a state . . . cannot complain of one sovereign['s] waiver of its right to exclusive custody of the defendant for vindication of its laws or choose the manner or order in which the sovereign proceeds.") (citations omitted).

The writ of habeas corpus ad prosequendum that brought Mr. Moody into Alabama's custody provided that he would be returned to federal custody once the state proceedings were completed. *See* D.E. 1, Exh. B. The language of the writ was consistent with 28 C.F.R. § 527.31(c), the federal regulation cited by Mr. Moody. So in one sense it may be said that Alabama wrongfully retained custody of Mr. Moody once the Alabama criminal proceedings were complete.

But the detainer which the United States lodged with Alabama in 1998 acknowledged that Mr. Moody was in state custody and requested only that Alabama provide the United States with notice "prior to [Mr. Moody's] release from [Alabama] custody" so that it could then "assume custody of [him] for

17

service of his Federal sentence of imprisonment." D.E. 1, Exh. G. The language of the detainer suggests that in the late 1990s the United States had decided to have Alabama keep custody of Mr. Moody for an indefinite period of time. *See Causey v. Civiletti*, 621 F.2d 691, 693 (5th Cir. 1980) ("Perhaps the federal government had the power to require that Causey's federal sentence be served first, immediately after the state prosecution was completed, but it did not choose to do so. This is evidenced by its issue of a detainer to the Florida Department of Corrections instructing that department to notify the United States Marshal['s] Service when Causey was released from state custody, so that his federal sentence could then be served.").

To the extent the detainer is ambiguous, the United States has told us, in writing and at oral argument, that it does not object to Alabama keeping custody of Mr. Moody for the purpose of carrying out the death sentence for the murder of Judge Vance. *See Ponzi*, 258 U.S. at 256. That representation eliminates the need for an evidentiary hearing to ascertain the position of the federal government. *Cf. Lebosky v. Saxbe*, 508 F.2d 1047, 1050–52 (5th Cir. 1975) (remanding for an evidentiary hearing to determine in part whether Louisiana had demanded, or the United States had agreed, that a prisoner be taken back into federal custody pursuant to a detainer). The question is whether the United States can waive its

primary custody of Mr. Moody and permit Alabama to proceed. We agree with the United States and Alabama that the answer to that question is yes.

A number of federal and state cases hold that someone in Mr. Moody's precise situation cannot delay his execution by the second sovereign until he finishes serving a non-capital sentence imposed by the first sovereign. *See Buchalter*, 141 F.2d at 259–60 (habeas corpus case – the Attorney General surrendered custody of a convicted federal prisoner to state authorities for execution on a subsequent state murder conviction); *Poland v. Stewart*, 117 F.3d 1094, 1097–98 (9th Cir. 1997) (habeas corpus case – the Attorney General transferred custody of a convicted federal prisoner to state court, where he was convicted of murder and sentenced to death, and chose to leave him in state custody); *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1300, 1303 (7th Cir. 1996), *vacated*, 522 U.S. 802 (1997), *reinstated in relevant part*, 141 F.3d 728, 734 (7th Cir. 1998) (habeas corpus case with a claim under the Illinois version of the Interstate Agreement on Detainers Act – the governor of Nevada, the state in which the prisoner was first convicted and sentenced to terms of life imprisonment, entered into an agreement with the governors of Illinois and Missouri that the prisoner would be housed in whatever state subsequently imposed the death penalty, and that if there was no death sentence, the prisoner would be returned to Nevada); *State v. Thornton*, 929 P.2d 676, 684 (Ariz. 1996) (direct appeal with a

19

claim under Arizona's version of the Interstate Agreement on Detainers Act – the prisoner was sentenced to death in Arizona but was not returned to the custody of the United States to finish serving his unexpired federal sentence).  We have not been able to find any contrary authority, and Mr. Moody has not pointed us to any.[3]

The rationale of these cases is that the prisoner does not have a cognizable federal right to require the first sovereign to take back custody and have him complete its unexpired sentence.  Judge Learned Hand put it this way in *Buchalter*, a case which is in all relevant respects identical to Mr. Moody's:

> Obviously, he [the prisoner] has actually the greatest possible interest in serving the remainder of his federal sentence, and the only question is whether that is an interest that the law recognizes: i.e., whether it is a 'right.'  It is not. . . . If it was unlawful for the Attorney General to surrender custody of the prisoner, and to make it impossible for any further execution of the federal sentence, it was not a wrong for him, for that sentence was imposed only in the interest of the United States, not in any degree whatever as a benefit to the relator.  He has been deprived of nothing to which he was entitled; if the United States has been so deprived, he may not vicariously assert its rights.

141 F.2d at 259–60.

---

[3] The main case cited by Mr. Moody, *In re Liberatore*, 574 F.2d 78, 87–90 (2d Cir. 1978), held that a federal court which had found a person serving a state sentence to be in civil contempt could not judicially suspend the pending state sentence in favor of the newly-imposed federal contempt sentence.  Although there is language in the opinion indicating that a loan of a prisoner by the first sovereign cannot affect the running of the sentence imposed by that sovereign, *see id.* at 89–90, the case did not involve any waiver by the first sovereign of its right to have its sentence carried out without interruption.

20

If these cases were the only ones on the books, we would have to decide whether to follow them as persuasive. Our own precedent, however, forecloses Mr. Moody's substantive assertion that the Alabama execution cannot be carried out until the federal sentences of life imprisonment are completed.

Decided about 20 years ago, *Remeta v. Singletary*, 85 F.3d 513 (11th Cir. 1996), involved a Florida prisoner who committed a series of murders in Florida and Kansas. He pled guilty in Kansas to three homicides and received several consecutive life sentences. He was then extradited to Florida, where he was convicted and sentenced to death for another murder occurring there. *See id.* at 515. After pursuing post-conviction relief in Florida, he filed a petition for a writ of habeas corpus in federal court, asserting among other things that under Florida's version of the Interstate Agreement on Detainers Act he could not be executed and had to be returned to Kansas. His argument was based in part on the fact that he had signed an extradition waiver which provided that he would be returned to Kansas following the criminal proceedings in Florida. *See id.* at 516–17.

We assumed that the waiver was not knowing and intelligent, but held that the prisoner was not entitled to habeas relief even if Kansas had not expressly agreed to leave him in Florida's custody: "Even if we were to assume that Florida has failed to honor its statutory commitment to Kansas under the IAD, . . . this appears to be a matter exclusively between Florida and Kansas. The resolution of

21

an IAD dispute between these two states (if such a dispute exists) may necessitate that Kansas seek an injunction to force Florida to abide by its agreement, return [the prisoner], and allow him to serve out his Kansas sentence. This is not a matter for federal habeas review." *Id.* at 519.

*Remeta* is consistent with a number of Former Fifth Circuit cases—many of which were cited by the district court—explaining that a person who has violated the laws of two sovereigns cannot choose (or have a federal court direct) which sentence he serves first, as long as the first sovereign consents to have the second sovereign take custody. *See Causey*, 621 F.2d at 692–94; *DeLong*, 474 F.2d at 720; *Chunn*, 451 F.2d at 1006; *Montos v. Smith*, 406 F.2d 1243, 1245 (5th Cir. 1969); *Zerbst v. McPike*, 97 F.2d 253, 254 (5th Cir. 1938). *Remeta* is also in accord with the general law in our sister circuits. *See, e.g., Jeter v. Keohane*, 739 F.2d 257, 258 (7th Cir. 1984); *Williams-El v. Carlson*, 712 F.2d 685, 686 (D.C. Cir. 1983).

Here the United States does not object to Alabama retaining custody of Mr. Moody for the purpose of carrying out the death sentence. Under the circumstances, Mr. Moody does not have a cognizable right to demand otherwise, and the statutes he relies on—18 U.S.C. §§ 3585(a) & 3621(c)—do not purport to remove or eliminate the United States' authority to decide whether a federal prisoner will serve his subsequently-imposed state sentence first. *Cf. Finley v.*

22

*United States*, 266 F.2d 29, 29 (5th Cir. 1959) (rejecting the claim that a federal prisoner could not be sent to state court for trial on pending state charges: "In the absence of objections from the United States, the probationer cannot object.  The question is one of comity between the United States and the State of Georgia.  The sovereign having prior jurisdiction and custody may waive that right and permit another sovereign to proceed.").[4]

## III

Mr. Moody has Article III standing to challenge Alabama's exercise of custody given his previously-imposed federal sentences, and his second claim does not amount to an unauthorized second or successive § 2254 habeas corpus petition.  The district court therefore erred in dismissing Mr. Moody's § 2241 petition for lack of subject-matter jurisdiction.  But we "may affirm on any ground supported

---

[4] At oral argument, Mr. Moody asserted that his due process rights were violated under the principles articulated in Justice O'Connor's concurring opinion in *Ohio Adult Parole Authority v. Woodward*, 523 U.S. 272, 288–89 (1998) (O'Connor, J., concurring in part and concurring in the judgment) (asserting that a "prisoner under sentence of death remains a living person and consequently has an interest in his life," and that as a result "some minimal procedural safeguards apply to a clemency proceeding").  But the due process claim he asserted in his § 2241 petition was that he was not given an opportunity to challenge the writ of habeas corpus ad prosequendum *before* it was served.  *See* D.E. 1 at 7 n.7.  If that is the argument, the claim had to be asserted soon after he was placed in Alabama's custody, or when the United States filed the detainer instructing Alabama to provide it with notification of Mr. Moody's release.  Although we do not address the issue, we note that some courts have rejected the proposition that a sovereign which submits or receives a writ of habeas corpus ad prosequendum must provide the prisoner in question with notice and an opportunity to be heard before the writ is complied with.  *See Stewart v. Bailey*, 7 F.3d 384, 391–93 (4th Cir. 1993); *Corgain v. Miller*, 708 F.2d 1241, 1251–52 (7th Cir. 1983).  *See also Atkinson v. Hanberry*, 589 F.2d 917, 919–20 (5th Cir. 1979) (holding that a federal prisoner has no constitutional right to a hearing before his transfer to a state prison pursuant to an interstate detainer).

by the record," *Trotter v. Sec'y, Dep't of Corr.*, 535 F.3d 1286, 1291 (11th Cir. 2008), and we agree with Alabama's alternative argument below that Mr. Moody's claims fail on the merits.   We therefore affirm the dismissal of Mr. Moody's petition, and remand with instructions that the district court convert the dismissal into one with prejudice.   *See Culverhouse*, 813 F.3d at 994 (concluding that the district court erred in concluding that the plaintiff lacked standing, but affirming its dismissal for failure to state a claim).

**APPEAL AFFIRMED ON MERITS GROUNDS AND REMANDED WITH INSTRUCTIONS.**